## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OJ COMMERCE, LLC,           )
          Plaintiff,     )
-vs-                 )     Case No.: 0:18-cv-61185-UU
                     )
ASHLEY FURNITURE INDUSTRIES, INC.  )
      Defendants    )
_____  )

### AMENDED COMPLAINT

OJ COMMERCE, LLC ("Plaintiff" or "OJC") sues defendant ASHLEY FURNITURE INDUSTRIES, INC. ("Defendant" or "Ashley") and alleges:

### PARTIES

1. Plaintiff is a Delaware company, comprised of a single Florida member, with its principal place of business in Broward County, Florida. OJC is an ecommerce retailer that sells various products to consumers through online marketplaces.

2. Defendant is a Wisconsin corporation, with its principal place of business in Trempealeau County, Wisconsin. Ashley manufacturers furniture and sells these products to retailers like OJC.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over Defendant pursuant to Fla. Stat. § 48.193 as Defendant engaged in substantial and not isolated activity within this state; operated, conducted, engaged in, and carried on a business or business venture in this state; had an office or agency in this state; and committed tortious acts within this state.

1

5.   Venue lies within this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

6.   Plaintiff has retained the undersigned firm to represent it in this action and has obligated itself to pay reasonable attorney's fees for its services.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The parties' early relationship

7.   In mid-2013, OJC and Ashley commenced a relationship whereby OJC would sell Ashley's products directly to consumers. OJC would receive orders from its customers, submit the orders to Ashley, and Ashley would ship OJC's customer orders directly to OJC's customers. OJC would then pay Ashley for these products.

8.   As part of that relationship, the parties entered into an Electronic Commerce Agreement that established a process by which OJC could submit electronic orders to Ashley for fulfilment. (DE 7-1).

9.   Over the course of the next 4+ years, OJC successfully sold over $13 million worth of Ashley's products to consumers.

### Ashley induced OJC to invest

10.   On January 19, 2017, Ashley employees called OJC to discuss OJC's marketing of Ashley products ("January Meeting"). Ashley employees Janel Abnet, Joey Daley, Ben Chmura, Cammy Onweller, Fabian Walters, Pal Montero, Maylen Hernandez, and Chris Ashby participated in this call.

11.   At the January Meeting, Ashley asked OJC to invest in their relationship by improving its Ashley catalogue through adding images, content, and making other marketing investments.

2

Ashley repeatedly promised OJC that if it undertook these substantial investments, Ashley would commit more merchandise, support, and personnel to OJC to ensure a successful long-term relationship.

12. On July 31, 2017, Ashley met with OJC again in Las Vegas at that Las Vegas Market ("July Meeting"). The July Meeting was arranged and conducted by Ashley employees Chris Ashby, Maylen Hernandez, Paul Montero, and Daniel Stack.

13. At the July Meeting, Ashley requested OJC to enter into an LTL[1] shipping relationship with Watkins Shepherd. Ashley knew that establishing the shipping relationship required OJC to invest in expensive custom information technology development.

14. Ashley induced OJC into making this substantial investment by promising OJC that if it undertook this investment, Ashley would grant OJC access to its very large product line of LTL only items through the end of 2018.  Ashley promised OJC that if it undertook this investment, Ashley would provide OJC with sufficient merchandise, discounts, incentives, and support that, in 2018, OJC would earn back all the money it invested, and more.

15. On September 28, 2017, Ashley initiated a conference call with OJC to follow up on OJC's progress in LTL integration and to discuss marketing for 2018 ("September Meeting"). Ashley employees Raul Montero, Chris Ashby, and Maylen Hernandez conducted the call for Ashley.

16.  At the September Meeting, Ashley requested OJC run, at great cost, various marketing promotions for the coming 2018 calendar year. Ashley promised OJC that if it undertook these expenses, OJC would be able to sell Ashley products throughout the entire 2018 calendar year and thereby earn back these investments. Ashley reiterated its promise that if OJC undertook this

---

[1] "LTL" means "less than truckload," a term used to refer to large shipment carriers.

investment, Ashley would provide OJC with sufficient merchandise, discounts, incentives, and support that, in 2018, OJC would earn back all the money it invested in these marketing promotions, in addition to the LTL investment.

17. In mid-November 2017, Ashley induced OJC to integrate with its inventory system in order to improve inventory communication between the parties (the "ATP System"). Ashley knew that establishing this ATP System required OJC to invest in expensive custom information technology development. Ashley employees Raul Montero, Chris Ashby, and Srilatha Reddy Gaddam spoke on behalf of Ashley for this ATP system.

18. Ashley induced OJC into making this substantial investment by promising OJC that if it undertook this investment, OJC would have, throughout 2018, "live" access to Ashley's inventory, and would therefore be able to list products as soon as Ashley received them, delist products no longer in-stock, and focus real-time marketing efforts on in-stock products. Ashley further promised that with this greater access, and increased merchandise, discounts, incentives, and support throughout the 2018 calendar year, OJC would earn back, in 2018, all the money it invested, and more.

19. Towards the end of 2017, Ashley requested OJC update its catalogue of Ashley products with the thousands of new and updated items Ashley had rolled out for 2018. Ashley reiterated its promise that if OJC undertook this investment, it would provide OJC with greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and more.  Ashley knew this update would be very costly to OJC.

20. On December 7, 2017, Ashley employees Raul Maylen and Chris Ashby visited OJC's facilities (the "December Meeting") and re-asserted all the promotions, investments, and marketing Ashley wanted OJC to invest in and run *through the end of 2018*.

21. Ashley promised OJC that in return for these investments, their relationship would continue for the full 2018 calendar year.

22. Ashley promised OJC that in return for its efforts, Ashley would provide OJC with various incentives and discounts throughout the entire 2018 calendar year instead of just providing these incentives during the holiday season. Ashley reiterated that it would provide greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and more.

23. By the end of the December Meeting, Ashley made multiple promises that it would: (i) support OJC through 2018 with personnel and promotions sufficient to regain its investments and profit; (ii) work together to ensure OJC could replicate the success of the 2017 holiday season throughout the *entire* 2018 calendar year; and (iii) promised that the year of 2018 would be the best year of its business relationship with OJC.

24. Ashley indicated it wanted to make this deal with OJC because historically, OJC had given them the most return on investment of any other vendor.

25. In reliance on all of Ashley's promises and representations, OJC spent significant resources preparing its 2018 offerings of Ashley products.

26. OJC dedicated a team of data analysts to review sales history, consumer patterns, and market conditions to generate market data on the best ways to promote and sell Ashley's products.

27. OJC used this data to market and promote Ashley's products by buying ads and keyword searches, using search engine optimization services, spending on product listings at various portals, and otherwise expending resources and funds related to marketing and promoting Ashley's products.

28. In reliance on Ashley's promises and representations, OJC employed a team of graphic designers, product specialists, data entry personnel, and program developers to update its catalogues and webpages.

29. In reliance on Ashley's promises and representations, OJC invested in programming and development to integrate with Watkins Shepard's LTL shipping system.

30. In reliance on Ashley's promises and representations, OJC invested in programming and development to integrate with Ashley's ATP System.

***Ashley terminated its relationship with OJC***

31. Contrary to the express representations and promises described above, on February 13, 2018, Ashley abruptly terminated its business relationship with OJC.

32. Daniel Stack, an Ashley employee, stated that the abrupt termination was because Ashley was changing its distribution strategy, and was not a result of any OJC acts or omissions.

33. As a result of OJC's reasonable reliance on Ashley's representations and Ashley's unreasonable and abrupt termination of its business relationship, OJC suffered damages.

## COUNT I - Breach of Contract

Plaintiff incorporates and realleges paragraphs 1 through 33 as though set forth herein.

34. OJC and Ashley entered into a valid contract through the oral agreements described above.

6

35. The allegations above demonstrate that the parties mutually assented to a certain and definite proposition that left no essential terms open. Specifically, the essential terms were that OJC promised to (a) setup Watkins Shepard's LTL shipping service, (b) integrate with Ashley's ATP System, (c) update all of Ashley's product listings, and (d) market and promote them, in exchange for Ashley's promise to (i) continue its business relationship with OJC through the end of the 2018 calendar year, and (ii) provide sufficiently greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and profit.

36. OJC has satisfied all conditions precedent to the contract, and has otherwise performed its obligations to Ashley.

37. Ashley materially breached the contract when it completely ceased its business relationship with OJC.

38. As a result of Ashley's wrongful action, OJC suffered monetary damages.

WHEREFORE Plaintiff seeks judgment against Defendant for damages in the amount to be determined at trial, including special, consequential, and incidental damages, actual costs of this action, including prejudgment and postjudgment interest, and all other relief the Court deems just and proper.

## COUNT II - Promissory Estoppel

Plaintiff incorporates and realleges paragraphs 1 through 33 as though set forth herein.

39. In the event this Court finds no contract exists, Plaintiff pleads in the alternative for promissory estoppel as permitted by Fed. R. Civ. P. 8.

40. As detailed above, Ashley made multiple promises to OJC for the purpose of inducing OJC into making the substantial investments discussed above.

41. The definite terms of Ashley's promises included its promise to continue its business relationship with OJC through the end of the 2018 calendar year, and to provide sufficiently greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and profit.

42. Ashley should have reasonably expected these promises to induce OJC's action in reliance on these promises.

43. OJC did, in fact, reasonably rely on Ashley's promises, and in reliance thereon, invested significant amounts of resources to (a) set up Watkins Shepard's LTL shipping service, (b) integrate with Ashley's ATP System, (c) update all of Ashley's product listings, and (d) market and promote them.

44. Injustice will result if Ashley's promise is not enforced and enforcement is necessary to avoid this injustice.

45. As a result of Ashley's wrongful action, OJC suffered damages.

WHEREFORE Plaintiff seeks judgment against Defendant for damages in the amount to be determined at trial, including special, consequential, and incidental damages, actual costs of this action, including prejudgment and postjudgment interest, and all other relief the Court deems just and proper.

### COUNT III - Fraudulent Misrepresentation

Plaintiff incorporates and realleges paragraphs 1 through 33 as though set forth herein.

46. In the event this Court finds no contract exists, OJC pleads in the alternative for fraudulent misrepresentation as permitted by Fed. R. Civ. P. 8.

47. Ashley made intentional false statements of material fact to OJC, namely that it would continue its business relationship with OJC throughout the 2018 calendar year, and provide sufficiently greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and profit.

48. The specific dates, times, and persons making such representations are identified above in the Facts Common to All Causes of Action section at the numerous meetings and calls that took place between the parties.

49. Ashley knew this representation to be false, as Ashley did not intend to maintain its business relationship with Plaintiff throughout the 2018 calendar year, or provide the greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year it promised.

50. This knowledge is demonstrated, in part, by Ashley's abrupt termination of its business relationship with OJC on February 13, 2018, without any valid reason.

51. Ashley made this false representation with the intention of inducing OJC into relying and acting on it. Specifically, by causing OJC to (a) set up Watkins Shepard's LTL shipping service, (b) integrate with Ashley's ATP System, (c) update all of Ashley's product listings, and (d) market and promote them.

52. OJC justifiably relied on Ashley's false statements, undertook the investments enumerated above, and was therefore damaged as a result. OJC would not have entered into these investments, but for the false statements made by the Ashley representatives enumerated above.

9

53. As a consequence of its fraud, Ashley obtained the benefit of OJC's marketing and promoting of its products.

WHEREFORE Plaintiff seeks judgment against Defendant for damages in the amount to be determined at trial, including special, consequential, and incidental damages, actual costs of this action, including prejudgment and postjudgment interest, and all other relief the Court deems just and proper.

## COUNT IV - Negligent Misrepresentation

Plaintiff incorporates and realleges paragraphs 1 through 33 as though set forth herein.

54. In the event this Court finds no contract exists, Plaintiff pleads in the alternative for negligent misrepresentation as permitted by Fed. R. Civ. P. 8.

55. Ashley made false statements of material fact to OJC, namely that it would continue its business relationship with OJC throughout the 2018 calendar year, and provide sufficiently greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year so that, in 2018, OJC would earn back all the money it invested, and profit.

56. The specific dates, times, and persons making such representations are identified above in the Facts Common to All Causes of Action section at the numerous meetings and calls that took place between the parties.

57. The Ashley representatives enumerated above were negligent in making this statement because (i) they made these statements without knowledge of their truth or falsity, and/or (ii) because they should have known that the statement was false and that Ashley did not intend to maintain its business relationship with Plaintiff throughout the 2018 calendar year, or provide the

greater access, increased merchandise, discounts, incentives, and support through the 2018 calendar year it promised.

58. Ashley made this false representation with the intention that OJC rely and act on it. Specifically, by causing OJC to (a) set up Watkins Shepard's LTL shipping service, (b) integrate with Ashley's ATP System, (c) update all of Ashley's product listings, and (d) market and promote them.

59. OJC justifiably relied on Ashley's false statements, undertook the investments enumerated above, and was therefore damaged as a result. OJC would not have entered into these investments, but for the false statements made by the Ashley representatives enumerated above.

60. As a consequence of its fraud, Ashley obtained the benefit of OJC's marketing and promoting of its products.

WHEREFORE Plaintiff seeks judgment against Defendant for damages in the amount to be determined at trial, including special, consequential, and incidental damages, actual costs of this action, including prejudgment and postjudgment interest, and all other relief the Court deems just and proper.

### COUNT V - Unjust Enrichment

Plaintiff incorporates and realleges paragraphs 1 through 33 as though set forth herein.

61. In the event this Court finds no contract exists, OJC pleads in the alternative for unjust enrichment as permitted by Fed. R. Civ. P. 8.

62. OJC's marketing, advertising, and promoting of Ashley's products have conferred a benefit on Ashley.

11

63. Ashley voluntarily, and without objection, appreciated, knew about, accepted, and retained, the benefit OJC conferred.

64. The circumstances are such that it would be inequitable for Ashley to retain the benefit of the marketing and promotion of its products without paying their fair value to OJC.

65. OJC is entitled to damages as a result of Ashley's unjust enrichment.

WHEREFORE Plaintiff demands monetary damages against Defendant for unjust enrichment and such other relief this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY FOR ALL ISSUES TRIABLE BY RIGHT**

Dated June 18, 2018                                        Respectfully submitted,

By: *s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
BOIES SCHILLER FLEXNER LLP
100 S.E. 2nd Street, Suite 2800
Miami, FL 33131
Tel: 305-539-8400
Fax: 305-539-1307
E-Mail: vfreedman@bsfllp.com

Shlomo Y. Hecht, Esq.
SHLOMO Y. HECHT, P.A.
11651 Interchange Cir. S.
Miramar, FL 33025
Tel: 954-861-0025
Fax: 615-413-6404
Email: Sam@hechtlawpa.com

*Counsel for Plaintiff, OJ Commerce LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed

12

on June 18, 2018 with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_s/ Velvel (Devin) Freedman_
Velvel (Devin) Freedman

## SERVICE LIST

Mitchell E. Widom
Raquel M. Fernandez
**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
1450 Brickell Ave, Suite 2300
Miami, Florida 33131
mwidom@bilzin.com
rfernandez@bilzin.com
eservice@bilzin.com